CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

11/07/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| **JASON KESSLER** and **IDENTITY EVROPA** and **NATIONAL SOCIALIST MOVEMENT** and **TRADITIONALIST WORKER'S PARTY** | ) ) ) ) ) ) ) | Case No.: 3:18CV00107 |
| Plaintiffs, | ) ) | **COMPLAINT** |
| v. | ) ) | |
|  | ) | **JURY DEMAND** |
| **CITY OF CHARLOTTESVILLE, VIRGINIA; AL THOMAS; BECKY CRANNIS-CURL** | ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs, for their Complaint against the above named Defendants, state as follows:

1.       This is an action for violations of Plaintiffs civil and constitutional rights under the First and Fourteenth Amendments,  28 USC §2201 and §2202; 42 USC § 1983 et seq., and demanding relief under Federal Rules of Civil Procedure 57 and 65. Defendants, by their acts, policies, practices, customs, and/or procedures deprived Plaintiff's of their right to engage in

political speech and expressive activities during the "Unite the Right" rally in Charlottesville, VA on August 12, 2017.

**Parties**

2.      Plaintiff Jason Kessler is a citizen of the United States and of the Commonwealth of Virginia. He was the organizer of the "Unite the Right" ("UTR") rally.

3.      Plaintiff Identity Evropa ("IE") is a corporation organized under the laws of California having it's principal place of business in California. IE was formed and exists for the purpose of engaging in political advocacy. IE members were present and attempted to engage in political speech and expressive activities at UTR.

4.      Plaintiff National Socialist Movement ("NSM") is a corporation organized under the laws of the Michigan having it's principal place of business in Michigan. NSM was formed and exists for the purpose of engaging in political advocacy. NSM members were present and attempted to engage in political speech and expressive activities at UTR.

5.      Plaintiff Traditionalist Worker's Party ("TWP") is a corporation organized under the laws of Michigan having it's principal place of business in Michigan. TWP was formed and exists for the purpose of engaging in political advocacy. TWP members were present and attempted to engage in political speech and expressive activities at UTR.

6.     Defendant City of Charlottesville is a municipality located in the

       Commonwealth of Virginia. It is sued via a *Monell* claim due to the

       misconduct of it's law enforcement final policy maker.

7.     Defendant Al Thomas was the Chief of Police of Charlottesville VA, and

       therefore a final policymaker, during all relevant times. He is sued in his

       individual and official capacities.

8.     Defendant Becky Crannis-Curl is a Virginia State Trooper ("VSP")

       holding the rank of Lieutenant. She is sued in her individual capacity.


## Jurisdiction and Venue

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

       § 1343, §2201 and §2202; 42 USC § 1983 et seq., and Federal Rules of

       Civil Procedure 57 and 65. Venue is proper over each claim and each

       defendant pursuant to 28 U.S.C. §1391(b)(1) and/or (b)(2).


## Facts

10.    Jason Kessler wished to engage in expressive political activity in

       opposition to a proposal by Charlottesville City Council to remove the

       statue of Confederate General Robert E. Lee from the former Lee Park in

       Charlottesville.

11.    Toward that end he sought to organize a political rally by persons or

       groups who were willing to oppose the removal of the statue.

12.    Plaintiffs IE, NSM, and TWP were willing to support this rally, or at least

had some members who wished to do so.

13.    Mr. Kessler was scheduled to speak at the rally and the other plaintiffs
       wished to hear Mr. Kessler and the other scheduled speakers and publicly
       demonstrate support for the them in the face of anticipated counter
       protests. Mr. Kessler, as well as some members of all other plaintiffs, were
       present in Charlottesville and attempted to speak at or otherwise
       participate in the UTR rally.

14.    The need for supporting speakers in the face of counter protests was no
       inchoate philosophical musing in 2017 in Charlottesville.

15.    Prior to Mr. Kessler's UTR event, on July 8, 2017, persons calling
       themselves "Ku Klux Klan" ("KKK") held a rally in Charlottesville.

16.    The KKK event drew numerous violent counter protestors.

17.    At both the beginning and the conclusion of the KKK event
       Charlottesville police had to form a corridor or picket line of police to
       allow KKK members to enter and exit their rally area.

18.    This was necessary as hundreds of violent counter protestors had blocked
       the KKK members ingress and egress routes and were assaulting both
       KKK members and police officers.

19.    Charlottesville police Lt. Durrette reported counter protestors threw
       tomatoes and water bottles and spit on police officers.

20.    One counter protestor reached past a police officer and punched a KKK
       member in the face.

21.    So out of the control were the violent counter protestors that police told

4

KKK to just keep moving through the mob rather than arrest the persons assaulting both KKK members and police officers.

22. The police successfully got the KKK members to a parking garage containing their vehicles, but the violent counter-protestors blocked the exits to the garage.

23. The police therefore declared the violent counter protestors an unlawful assembly under Virginia law and used force to clear the parking garage exits.

24. KKK members were thereafter able to safely exit the area.

25. Police ultimately made 22 arrests stemming from this violence, none of whom were Klan members.

26. In the wake of July 8, 2017 KKK event the Charlottesville police were heavily criticized by some in the local community.

27. The police were not criticized for failing to adequately keep the peace on July 8, but rather for being too harsh in their treatment of the violent counter-protestors.

28. At a public City Council meeting on July 17, 2017 the Council was peppered with citizen comments complaining about police overreaction to violent protestors and insisting that police had no duty to protect "hate speech" of the Klan members.

29. Some citizens made specific reference to the forthcoming UTR rally and

5

demanded to know what the police were going to do about it. The crowd also demanded that Mr. Kessler's permit to hold his UTR rally be revoked by Charlottesville.

30. Thereafter, the City actually revoked a permit that had been issued to Mr. Kessler to hold his UTR rally in a park holding the General Lee statue in Charlottesville.

31. This revocation necessitated Mr. Kessler suing the City in federal Court.

32. The Western District of Virginia ultimately ruled in Mr. Kessler's favor And ordered the City to permit the Plaintiff's their political speech and expressive activities on August 12, 2017 in Charlottesville.

33. At the actual UTR event on August 12, 2017  Chief Thomas and Lt. Crannis-Curl were present in a supervisory and/or final decision making capacity. Charlottesville police divided the protest area up into 5 police zones. Each zone had a police supervisor and Lt. Crannis-Curl supervised all VSP present.

34. Former Chief Al Thomas was present in his capacity as Chief of Police of the Charlottesville City Police Department. As Chief, Mr. Thomas was a final decision maker regarding law enforcement in Charlottesville at all relevant times.

35. Lt. Becky Crannis-Curl was a Lieutenant serving as Ground Commander for all Virginia State police officers present.

36. Upon being advised that violence had broken out the Chief stated, in a

6

complete capitulation to violent counter protestors, "Let them fight, it will make it easier to declare an unlawful assembly."

37. After UTR Al Thomas destroyed relevant evidence by deleting text messages and other electronic information and then using personal e-mail to discuss particularized FOIA requests by the Charlottesville's own choice for professional review of the event.

38. Al Thomas falsely denied wrongly using his personal email to deal with public records requests.

39. Many Charlottesville police officers told investigators working for the City that they feared "retribution" from Al Thomas if they told the truth about protest events.

40. Lt. Crannis-Curl allowed the heckler's veto as soon as people began arriving for the UTR event. She advised fellow VSP members that she was going "off-plan" and refused to send "arrest teams" into the street.

41. Lt. Crannis-Curl effectively communicated this order to all VSP under her command.

42. Other VSP troopers advised Charlottesville police that they would not send VSP troopers to engage the crowd "if safety was compromised." Still other VSP officers advised either citizens or City police they were "under orders" not to intervene or "not to break up fights."

43. So strictly did VSP adhere to this non-intervention order that even when

citizens directly begged for help the VSP refused stating they were "not available" to help. Another VSP trooper advised a citizen he would not intervene until "ordered to do so."

44.  As if this were not bad enough a Charlottesville politician witnessed a man fire a handgun into the ground nearby numerous persons.

45.  The politician followed the shooter and identified him and his illegal conduct to a nearby VSP trooper. The trooper took no action whatsoever even though a public official had made the report.

46.  Charlottesville police were operating under a similar non-intervention order initiated by Chief Al Thomas.

47.  On July 8, 2017 the Charlottesville police had done their jobs and separated protestors from violent counter protestors.

48.  In preparation for UTR on August 12, 2017 Chief Thomas made it very clear that his police would not be doing their jobs this time.

49.  Chief Thomas told his subordinates after the July 8 event that "I'm not going to get [protestors] in and out" during the UTR rally.

50.  On August 12 Chief Thomas, when advised that fights were occurring at UTR ordered "let them fight, it will make it easier to declare an unlawful assembly."

51.  A third party report commissioned by the City after August 12 found that "Rather than engage the crowd and prevent fights, the [Charlottesville police department] plan was to declare the event unlawful and disperse the crowd."

52. Charlottesville officers received the orders implementing this plan loud and clear.

53. Charlottesville Officers told third party investigators that they had been ordered not to engage over "every little thing"; not to "go in and break up fights"; not to interrupt "mutual combat"; and officers were not to be sent out among the crowd where they might get hurt.

54. Charlottesville police obeyed these orders. At one point a citizen begged them to do something while fighting broke out directly in front of Charlottesville police officers. The fighting had started when counter protestors crowded around a park entrance and refused UTR attendees access to the rally location. The officers simply stood in silence staring at the results of this in progress heckler's veto.

55. Eventually, law enforcement moved in, broke up the fighting and declared an unlawful assembly, this time not just against violent counter-protestors as on July 8th, but against everybody.

56. As a result, neither Mr. Kessler nor anyone else was able to speak at the UTR rally. Plaintiffs were unable to peacefully rally, hear any of the speakers, or engage in other lawful political speech or expressive activity. Moreover, Plaintiffs were forced to defend themselves from physical violence wrongfully perpetrated by violent counter protestors.

57. Defendants expected violent counter protestors to attempt a hecklers veto on of the UTR rally.

58. Defendants had received intelligence prior to August 12, 2017 that violent

9

counter protestors would be in attendance and planning to engage in violence including by throwing soda cans filled with concrete.

59. The night and day difference between police activity on July 8, 2017 and August 12, 2017 coupled with the knowledge that violent counter protestors would again be present on August 12, establishes that defendants willfully, maliciously, and with deliberate indifference to the Plaintiff's rights, acquiesced in a heckler's veto of the Plaintiffs on August 12, 2017.

60. The City of Charlottesville routinely grants permits for public spaces to persons it deems to have non-controversial or acceptable political views. It also permits unpermitted and technically unlawful rallies to be held by those with what the City considers acceptable political views.

61. Yet the defendants acquiesced in a heckler's veto of the plaintiff's views because Charlottesville is the "capital of the resistance" and "intolerance is not welcome here."

62. All actions of all defendants complained of herein were taken under color of state law and were deliberately indifferent to the rights of the plaintiffs.

**First Cause of Action**

**(Freedom of Speech-First Amendment)**

63. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

64. By reason of the aforementioned acts, policies, practices, procedures,

and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right to freedom of speech in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

65. At the time Plaintiffs were ordered to leave the UTR rally they were attempting to engage in speech activity that was protected by the First Amendment. Defendants' actions injured Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity. Plaintiffs' constitutionally protected activity motivated Defendants' adverse actions. Thus, Defendants acted with a retaliatory intent or motive.

66. It was clearly established on August 12, 2017, that Defendants had a constitutional duty not to ratify and effectuate a heckler's veto nor join a mob of counter protestors intent on suppressing speech. Instead, Defendants were required to take reasonable action to protect from violence persons exercising their constitutional rights, including Plaintiffs. By failing to do so, Defendants violated Plaintiffs' rights protected by the First Amendment.

67. By effectuating or acquiescing in the heckler's veto in this case Defendants' actions were content- and viewpoint-based in violation of the First Amendment.

68. Defendants' heckler's veto policy and/or practice and its enforcement

against Plaintiffs as set forth in this Complaint violated Plaintiffs' right to freedom of speech protected by the First Amendment. Defendant's actions were taken under color of state law and were willful, wanton, malicious, and/or deliberately indifferent to Plaintiff's rights.

69. As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

**Second Cause of Action**

**(Equal Protection-Fourteenth Amendment)**

70. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

71. By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and/or enforced under color of state law, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

72. By granting use of a public forum to people whose political views Defendants find acceptable, but denying use to those expressing less favored or more controversial views, such as those expressed by Plaintiffs, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

73. Defendants' policy, practice, and actions as applied against

Plaintiffs' political speech activity on August 12, 2017 violated the Equal Protection Clause of the Fourteenth Amendment. Defendant's actions were taken under color of state law and were willful, wanton, malicious, and/or deliberately indifferent to Plaintiff's rights.

74. As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

## Third Cause of Action

### (Supervisory Liability)

75. Plaintiffs reallege the foregoing paragraphs as if fully rewritten herein.

76. Defendants Thomas and Crannis-Curl were both supervisors of police personnel on August 12, 2017.

77. Defendants Thomas and Crannis-Curl each issued orders and/or acquiesced in actions that violated the rights of the plaintiffs as stated herein. Defendants Thomas and Crannis-Curl each reasonably could have and should have stopped, or tried to stop, the heckler's veto from occurring. Instead, they each took affirmative steps to see that said heckler's veto successfully negated the Plaintiff's rights.

78. Defendants Thomas and Crannis-Curl's misconduct was taken under color of state law and was willful, wanton, malicious, and/or deliberately indifferent to the constitutional rights of the plaintiffs.

79. As a direct and proximate result of Defendants' actionable misconduct,

Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

A. to declare that Defendants violated Plaintiffs' fundamental constitutional rights as set forth in this Complaint;

B. to permanently enjoin Defendants' heckler's veto policy and practice and its application to Plaintiffs' speech and related activities as set forth in this Complaint;

C. To award Plaintiffs nominal damages against Charlottesville and all official capacity defendants;

D. To award Plaintiffs compensatory damages in an amount to be shown at trial against all individual capacity defendants;

E. Punitive damages against all individual capacity defendants;

F. Costs incurred in this action;

G. Reasonable attorney fees;

H. Prejudgment interest;

I. Such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

s/ Elmer Woodard_____

**Elmer Woodard**

14

**Attorney at Law**
**5661 US Hwy 29**
**Blairs VA 24527**
**434-878-3422**
**VSB 27734**
**isuecrooks@comcast.net**
Trial Attorney for Plaintiffs


s/

_____

JAMES E. KOLENICH (0077084)
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
(513) 444-2150
(513) 297-6065 (fax)
jek318@gmail.com
*PHV pending*