IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JASON KESSLER AND NATIONAL
SOCIALIST MOVEMENT AND
TRADITIONALIST WORKER'S PARTY,

    Plaintiffs,

v.                                                  Case No. 3:18-cv-00107-NKM

CITY OF CHARLOTTESVILLE, VIRGINIA
AND AL THOMAS AND BECKY
CRANNIS-CURL,

    Defendants.

## BRIEF IN SUPPORT OF AL THOMAS'S MOTION TO DISMISS

### I.      INTRODUCTION

Jason Kessler ("Kessler"), the organizer of the Unite the Right ("UTR") rally, along with the National Socialist Movement ("NSM") and Traditionalist Worker's Party ("TWP") (collectively "Plaintiffs") have sued the City of Charlottesville ("City"), former Chief of Police Al Thomas ("Chief Thomas"), and Virginia State Police Lieutenant Becky Crannis-Curl ("Lt. Crannis-Curl") (collectively "Defendants") for violation of their First Amendment rights to freedom of speech and Fourteenth Amendment rights to equal protection.  Plaintiffs allege that on August 12, 2017, Defendants effectuated and acquiesced to a heckler's veto when they failed to quell violent counter-protestors in order to ensure that the UTR could occur as planned and, instead, declared an unlawful assembly and dispersed the entire crowd.

The Amended Complaint against Chief Thomas should be dismissed in its entirety for several reasons.  First, neither NSM nor TWP have standing to maintain this lawsuit.  Second, there was no violation of Plaintiffs' First Amendment rights to freedom of speech, as they were

not entitled to protection, an unlawful assembly was declared and the entire crowd—protestors and counter-protestors—dispersed.  This dispersal was a content- and viewpoint-neutral restriction on speech.  "The First Amendment does not protect violence."  *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982).  Third, Plaintiffs were not disparately treated or the subject of intentional discrimination.  Finally, Plaintiffs have not stated a claim for supervisory liability against Chief Thomas, who is entitled to qualified immunity.

## II.   ALLEGATIONS

Kessler obtained a permit to hold the UTR rally in the former Lee Park in Charlottesville on August 12, 2017.  (ECF Doc. 2, at ¶¶ 29-32.)  The purpose of the rally was to oppose "a proposal by Charlottesville City Council to remove the statue of Confederate General Robert E. Lee from the former Lee Park in Charlottesville."  (*Id.* at ¶ 10.)  Kessler was scheduled to speak at the rally.  (*Id.* at ¶ 13.)

Prior to the UTR rally, the Ku Klux Klan ("KKK") held a rally in the City on July 8, 2017.  (*Id.* at ¶ 15.)  That rally drew many violent counter-protestors, and the City police had to form a corridor to allow KKK members to enter and exit the rally area.  (*Id.* at ¶ 17.)  Once police escorted the KKK members to a parking garage, counter-protestors blocked the garage exits and the police declared the counter-protestors an unlawful assembly and used force to clear the garage.  (*Id.* at ¶¶ 22-23.)  Police arrested 22 counter-protestors as a result of the violence on July 8, 2017.  (*Id.* at ¶ 25.)

After the KKK rally, the City revoked Kessler's permit to hold the UTR rally in the former Lee Park.  (*Id.* at ¶ 30.)  Kessler responded by filing suit in federal court, and Judge Conrad ultimately ordered the City to grant the permit.  (*Id.* at ¶¶ 31-32.)

Plaintiffs allege that at the UTR rally on August 12, 2017, Chief Thomas issued a non-intervention order such that his officers did not intervene to stop the counter-protestors.  (*Id.* at ¶¶ 46, 48-51.)  "Eventually, law enforcement moved in, broke up the fighting and declared an unlawful assembly, this time not just against violent counter-protestors as on July 8th, but against everybody."  (*Id.* at ¶ 55.)  Plaintiffs allege that, "[a]s a result, neither Kessler nor anyone else was permitted to speak at the UTR rally, they were unable to peacefully rally, hear any of the speakers, or engage in other lawful political speech or expressive activity," and "were forced to defend themselves from physical violence wrongfully perpetrated by violent counter protestors." (*Id.* at ¶ 56.)  They allege that Defendants effectuated and acquiesced to a heckler's veto, thereby violating their First Amendment rights to freedom of speech and Fourteenth Amendment rights to equal protection.

## III.   ARGUMENT

### A.   Standard of Review.

#### 1.   Rule 12(b)(1).

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal of a claim when the court lacks subject matter jurisdiction over the action.  A motion to dismiss for lack of standing is proper pursuant to Rule 12(b)(1), because, absent standing, a court lacks subject matter jurisdiction.  *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).  When confronted with such a motion, the burden of proving subject matter jurisdiction is on the plaintiff.  *Richmond, Fredericksburg & Potomac R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991).  As standing elements are "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  In deciding a Rule 12(b)(1) motion to dismiss, the Court may consider evidence outside of the pleadings without converting the proceeding to one for summary judgment. *Richmond, Fredericksburg & Potomac R. Co.*, 945 F.2d at 768.

    2.    **Rule 12(b)(6).**

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is "to test the legal sufficiency of the complaint." *Randall v. U.S.,* 30 F.3d 518, 523 (4th Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim is "plausible" when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Twombly,* 550 U.S. at 556.  A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where the allegations permit a court to infer no more than a possibility of misconduct. *See Iqbal,* 556 U.S. at 678–79.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *See id.* at 678.

The Court need not accept legal conclusions that are presented as factual allegations, *Twombly*, 550 U.S. at 555, or "unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action will not

do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual

enhancement."  *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557); *see also, Tobey v.*

*Jones,* 706 F.3d 379 at 387–88 (4th Cir. 2013).

**B.**      **NSW and TWP lack standing.**

"Standing is a threshold jurisdictional question which must be addressed prior to and

independent of the merits of a party's claims."  *Bochese v. Town of Ponce Inlet*, 405 F.3d 964,

974 (11th Cir. 2005).  There are three elements to establish constitutional standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally
> protected interest which is (a) concrete and particularized and (b) "actual or
> imminent, not conjectural or hypothetical."   Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to
> be fairly traceable to the challenged action of the defendant and not the result of
> the independent action of some third party not before the court.  Third, it must be
> "likely," as opposed to merely "speculative" that the injury will be "redressed by
> a favorable decision."

*Lujan*, 504 U.S. at 560 (internal quotations and citations omitted).  The party invoking federal

jurisdiction bears the burden of establishing standing.  *Id.* at 561.  An association has standing to

sue on behalf of its members if they would have standing to sue on their own, the association

seeks to protect interests germane to its purpose, and neither the claim asserted nor the relief

requested requires its individual members to participate in the lawsuit.  *Hunt v. Walsh State*

*Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs allege generally that NSM and TWP are corporations formed and existing "for

the purpose of engaging in political advocacy" and that their "members were present and

attempted to engage in political speech and expressive activities at UTR."  (ECF Doc. 2, at ¶¶ 3-

4.)  They further allege that NSM and TWP "were willing to support this rally, or at least had

some members who wished to do so."  (*Id.* at ¶ 12.)  Plaintiffs do not allege that NSM or TWP

suffered an injury or a violation of their organizations' constitutional rights.  *See Amnesty Inter.,*

*USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009).   A mere interest in a problem is not sufficient to confer standing on an organization.   *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).   As such, it appears as though NSM and TWP are relying upon representational standing.

However, even under a theory of representational standing, NSM and TWP have not alleged facts sufficient to show that they have standing to assert claims against Defendants. First, NSM and TWP have not identified any members that were present at the UTR rally and denied the opportunity to speak.   They assert generally that "members were present and attempted to engage in political speech and expressive activities" but do not identify those individuals. (ECF Doc. 2, at ¶¶ 3-4.)  Furthermore, Plaintiffs assert only that they wished to hear Kessler "and the other scheduled speakers and publicly demonstrate support for them in the face of anticipated counter protests."  (*Id.* at ¶ 13.)

Second, NSM and TWP have not identified how they are seeking to protect interests germane to their stated purpose of "political advocacy."   Finally, NSM and TWP have not alleged that the claims asserted and the relief requested do not require their individual members to participate.  *See Amnesty Inter., USA*, 559 F.3d at 1178 (denying organizational standing where it is unclear whether the lawsuit requires the participation of individual members); *Am. Humanist Ass'n, Inc. v. City of Ocala*, 127 F. Supp. 3d 1265, 1278 (M.D. Fla. 2015) (same).

As such, NSM and TWP lack standing to pursue their claims against Defendants, and their claims should be dismissed for lack of subject matter jurisdiction.

## C.   Plaintiffs' official capacity claims against Chief Thomas are duplicative of the claims against the City.

Plaintiffs have alleged claims against Chief Thomas in both his individual and official capacities.   Further, Plaintiffs have alleged that Chief Thomas was the Chief of Police of Charlottesville, Virginia at all times relevant to this litigation.  (*See* ECF Doc. 2, at ¶ 6.)  As

such, Plaintiffs' official capacity claims against Chief Thomas are duplicative of the claims against the City and should be dismissed for that reason.

It is well-settled that a claim brought against a public official in his official capacity is treated as an action against the public employer. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991) (finding that "the real party in interest in an official-capacity suit is the governmental entity and not the named official"); *Kentucky v. Graham,* 473 U.S. 159, 165 (1985) (noting that such suits are to be treated as a suit against the entity and that any recovery comes from the entity, not the person sued).  As such, official capacity claims should be dismissed as being duplicative or redundant when the governmental entity that employed the individual is also a defendant.  *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."); *Ruttenberg v. Jones*, 603 F. Supp. 2d 844, 862 (E.D. Va. 2009) (dismissing official capacity claims against a police officer, detective, and chief as duplicative of the claims against the city), *Mainstream Loudoun v. Board of Trustees of Loudoun County Library*, 2 F. Supp. 2d 783, 790 (E.D. Va. 1988) (dismissing official capacity claims as redundant, finding that "plaintiffs' suit against the [governmental entity] itself, if successful, [would] provide plaintiffs with full relief against enforcement of the Policy.").

Because the City is a party to this litigation, the official capacity claims against Chief Thomas should be dismissed with prejudice.

**D.** **Plaintiffs have not stated a claim for violation of their First Amendment rights to free speech.**

In the First Cause of Action, Plaintiffs allege that Defendants effectuated or acquiesced to a heckler's veto and, thereby, engaged in a content-and viewpoint-based restriction in violation of the First Amendment.  (ECF Doc. 2, at ¶¶ 66-67.)  Plaintiffs' allegation that Defendants

engaged in content and viewpoint-based restriction is a legal conclusion that is not accepted as true for the purposes of this motion.  *Twombly*, 550 U.S. at 555.

### 1.   Defendants did not engage in a content and viewpoint-based restriction.

Plaintiffs' assertion that Defendants engaged in a content and viewpoint-based restriction of their speech rests upon the allegation that Defendants effectuated or acquiesced to a heckler's veto.  (ECF Doc. 2, at ¶¶ 66-67.)  It is true that, "[l]isteners' reaction to speech is not a content-neutral basis for regulation, or for taking an enforcement action against a peaceful speaker." *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 247 (6th Cir. 2015) (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)).  The heckler's veto is, thus, subject to strict scrutiny.  *Id.* at 248 (citing *McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014)).

> The rule to be followed is that when the police seek to enforce law and order, they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens.  . . .  **The police may** go against the hecklers, cordon off the speakers, or **attempt to disperse the entire crowd if that becomes necessary.**  Moreover, they may take any appropriate action to maintain law and order that does not destroy the right to free speech by indefinitely silencing the speaker.

*Id.* (citing *Gregory v. City of Chicago*, 394 U.S. 111, 120 (1969)).

In the present case, law enforcement declared an unlawful assembly.  (ECF Doc. 2, at ¶ 55.)  Plaintiffs have not challenged the validity of this declaration.  The unlawful assembly statute provides, in relevant part,

> Whenever three or more persons assembled share the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order, and the assembly actually tends to inspire persons of ordinary courage with well-grounded fear of serious and immediate breaches of public safety, peace or order, then such an assembly is an unlawful assembly.

Va. Code § 18.2-406.  The United States District Court for the Eastern District of Virginia has held that the unlawful assembly statute does not violate First Amendment rights to freedom of speech.  *United Steelworkers of Am., AFL-CIO-CLC v. Dalton*, 544 F. Supp. 282, 289 (1982).  Section 18.2-406 "requires the existence of circumstances evidencing a present threat of violence or breach of public order. There is no doubt that the states retain the right to maintain public order. . . . On its face, [section] 18.2-406 does not impermissibly infringe upon plaintiffs' first amendment rights." *Id.*

The Supreme Court has also acknowledged the authority of police to regulate speech when there is a threat to public safety.  "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace or order, appears, the power of the state to prevent or punish is obvious."  *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).  "The First Amendment does not protect violence." *Claiborne Hardware Co.*, 458 U.S. at 916.

The facts of the present case stand in contrast to those in *Bible Believers*.  In *Bible Believers*, a self-described evangelical group attended the May 2012 Arab International Festival in Dearborn, Michigan to try and convert non-believers and call sinners to repent.  805 F.3d at 236-37.  The group had attended the 2011 Festival where they had been permitted to occupy the "free speech zone" on the first day of the festival, but were assaulted by festival goers and removed by the sheriff's office on the second day of the festival as they walked through the festival grounds.  *Id.* at 236.  In anticipation of the 2012 Festival, the Bible Believers sent a letter to the County and Sherriff identifying the problems from 2011 and advising the County that the group would be returning for the 2012 Festival.  *Id.* at 236-37.  The County responded by

9

disagreeing with both the Bible Believers' version of events and the duties owed the group under the law.  *Id.* at 237.

During the 2012 Festival, the group wore t-shirts with their messages, carried signs, and carried a severed pig's head on a spike.  *Id.* at 238.  The group preached to the Festival attendees, and onlookers began to throw plastic bottles and debris.  *Id.* at 239.  Each time a police officer would approach, the crowd would cease its assault.  *Id.* at 239-40.  Eventually the Bible Believers were removed from the festival grounds in lieu of being arrested for disorderly conduct.  *Id.* at 240-41.  Deputies informed the Bible Believers that they "were attracting a crowd and . . . affecting public safety."  *Id.* at 240.

The United States District Court for the Eastern district of Michigan entered summary judgment in favor of the defendants, and the Bible Believers appealed to the Sixth Circuit Court of Appeals, which affirmed the decision of the District Court.  *Id.* at 241-42.  An en banc review followed, and the Sixth Circuit reversed the District Court's decision and entered summary judgment in favor of the Bible Believers.  *Id.* at 242, 261-62.  The Sixth Circuit determined that the County had violated the Bible Believers' First Amendment rights by effectuating a heckler's veto, violated their free exercise rights and rights to equal protection, and that the individual deputies were not entitled to qualified immunity.  *Id.* at 255-60.

Unlike the situation in *Bible Believers*, where the peaceful protestors were removed from the event because of the violent actions of the listeners, thereby violating the protestors' First Amendment rights by effectuating a heckler's veto, there was no such violation in the present case.  Neither the declaration of unlawful assembly nor the dispersing of both the UTR protestors and the counter-protestors, violated Plaintiffs' First Amendment rights to freedom of speech.  By its very nature, the dispersing of both the protestors and counter-protestors was a content- and

viewpoint-neutral restriction on speech.  Plaintiffs admit that they were not "peaceful speakers" or "law-abiding citizens" in that they allege they "were forced to defend themselves from physical violence wrongfully perpetrated by violent counter protestors."  (ECF Doc. 2, at ¶ 56.) As such, the First Cause of Action does not state a claim and should be dismissed with prejudice.

### 2.      The First Amendment does not require police to protect Plaintiffs.

The crux of Plaintiffs' First Amendment claim appears to be that law enforcement did not take sufficient action to quell the counter-protestors, thereby permitting the UTR rally to proceed.  Instead, Plaintiffs allege that law enforcement purposefully did nothing so that they could declare an unlawful assembly and disperse the entire crowd.  (ECF Doc. 2, at ¶¶ 36, 46, 48-55.)

While Plaintiffs do enjoy a First Amendment right to freedom of speech, they do not have a constitutional right to protection.  **As the Fourth Circuit has held, "[T]here simply is 'no constitutional right to be protected by the state against . . . criminals or madmen,'" and a state actor's "'failure to do so is not actionable under section 1983.'"**  *Doe v. Rosa*, 795 F.3d 429, 440 (citing *Fox v. Castes,* 712 F.2d 84, 88 (4th Cir. 1983); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982)); *see also Turner v. Thomas*, 313 F. Supp. 3d 704 (W.D. Va. 2018).

Again, the facts of this case stand in stark contrast with those of *Bible Believers*.  In *Bible Believers*, the protestors were peaceful and did not engage with the counter-protestors.  As such, the Sixth Circuit concluded that there were less restrictive means available to the sheriff's deputies to maintain public order in lieu of removing the Bible Believers from the festival.  *Id.* at 254.  The court noted that the County could have "increase[ed] police presence in the immediate vicinity, as was requested; erect[ed] a barricade for free speech, as was requested; arrest[ed] or threaten[ed] to arrest more of the law breakers, as was also requested; or allow[ed] the Bible

Believers to speak from the already constructed barricade to which they were eventually secluded prior to being ejected from the Festival." *Id.* The court also noted that the County could have called for backup if these measures were not feasible or were deemed unlikely to prevail before infringing on the group's First Amendment rights. *Id.*

In the present case, however, law enforcement officers were not faced with violent counter-protestors attacking peaceful protestors. Instead, there was mutual violence and fighting between both protestors and counter-protestors such that law enforcement observed "acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order" tending to inspire "serious and immediate breaches of public safety, peace or order." Va. Code § 18.2-406. These circumstances necessitated the dispersal of the entire crowd, not just one side or the other. This did not violate Plaintiffs' First Amendment rights to freedom of speech. As such, the First Cause of Action fails to state a claim and should be dismissed with prejudice.

**E.** **Plaintiffs have not stated a claim for an equal protection violation.**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. Amend. XIV, §1.* The equal protection requirement "does not take from the States all power of classification," *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 271 (1979), but "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992).

Thus, "[t]he [Equal Protection] Clause requires that similarly-situated individuals be treated alike." *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008). In order to make out a claim under the Equal Protection Clause, a plaintiff must demonstrate that he has been treated differently from others similarly situated and that the unequal treatment was the result of

intentional discrimination.  *Sandlands C & D LLC v. County of Horry,* 737 F.3d 45, 55 (4th Cir. 2013) (holding that there is no equal protection claim where the plaintiff does not establish that he was treated differently or subject to purposeful discrimination); *Morrison v. Garraghty*, 239 F.3d 648, 652 (4th Cir. 2001); *Brown v. Wilson*, No. 3:13CV599, 2015 WL 3885984, at *6 (E.D. Va. 2015); *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

A complaint that merely asserts that the plaintiff was treated differently from others without specifying how the others were similarly situated will be dismissed.  *See, Nofsinger v. Va. Commonwealth Univ.* 523 F. App'x 204, 206 (4th Cir. 2013) (affirming dismissal of equal protection claim where plaintiff alleged she was treated differently from others, but failed to specify how the others were similarly situated).  In the equal protection context, "similarly situated" means that the individuals "are in all relevant respects alike." *Veney*, 293 F.3d at 730–31 (quoting *Nordlinger*, 505 U.S. at 10).

In *Bible Believers*, the Sixth Circuit held that the County violated the Bible Believers right to equal protection because "[t]he county's disparate treatment of the Bible Believers was based explicitly on the fact that the Bible Believers' speech was found to be objectionable by a number of people attending the festival." *Bible Believers*, 805 F.3d at 257.  In that case, there were "a number of other religious organizations that came to share their faith by spreading a particular message." *Id.* at 256.  Yet, the County "violated the Bible Believers' right to equal protection by treating them in a manner different from other speakers, whose messages were not objectionable to Festival-goers, by burdening their First Amendment rights." *Id.* at 257.

Plaintiffs have alleged generically that "by granting use of a public forum to people whose political views Defendants find acceptable, but denying use to those expressing less favored or more controversial views, such as those expressed by Plaintiffs, Defendants have

13

violated the Equal Protection Clause of the Fourteenth Amendment."   (ECF Doc. 2, at ¶ 72.)

First, Plaintiffs have not, and cannot, allege that Chief Thomas granted or denied use of a public

forum to anyone.   In fact, Plaintiffs allege that **the City** revoked Kessler's permit necessitating

Court intervention, not Chief Thomas.   (*Id.* at ¶¶ 30-32.)   Second, Plaintiffs have not identified

how they were treated differently from others who were similarly situated.    Importantly,

Plaintiffs allege that an unlawful assembly was declared on August 12, 2017 "against

everybody."   (*Id.* at ¶ 55.)   As such, Plaintiffs were treated in the same manner as the allegedly

"violent counter-protestors."   (*Id.*)   Pursuant to plaintiffs' own allegations there was no disparate

treatment or intentional discrimination.   Therefore, the Second Cause of Action fails to state a

claim and should be dismissed with prejudice.[1]

**F.**      **Plaintiffs have not stated a claim for supervisory liability.**

In the Third Cause of Action, Plaintiffs allege that Chief Thomas "issued orders and/or

acquiesced in actions that violated the rights" of Plaintiffs, "reasonably could have and should

have stopped, or tried to stop, the heckler's veto from occurring," and "took affirmative steps to

see that said heckler's veto successfully negated the Plaintiff's [sic] rights."   (ECF Doc. 2, at ¶

77.)

It is well-settled that "there is no respondeat superior liability under [Section 1983]."

*Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004), *cert. denied* 543 U.S. 813 (2004) (citing

*Monell v. Dep't of Soc. Srvs.*, 436 U.S. 658 (1978)).   Given that limitation, supervisors can only

---

[1] To the extent that Plaintiffs premise their equal protection claim on the allegedly disparate
treatment between that which they received and that which the KKK received on July 8, 2017,
Plaintiffs still do not state a claim.   The content and viewpoints of Plaintiffs and the KKK are
aligned—both were protesting the planned removal of the Robert E. Lee statute—and, as such,
any disparate treatment was not content- or viewpoint-based in violation of the First
Amendment.

be held liable in their individual capacities for their personal wrongdoing or supervisory actions that violated constitutional norms.  *Harbeck v. Smith*, 814 F. Supp. 2d 608, 627 (E.D. Va. 2011).

In *Iqbal,* the Supreme Court specifically rejected a claim based on a supposed theory of "supervisory liability."   The plaintiff in *Iqbal* argued that the supervisors' knowledge and acquiescence in their subordinate's discriminatory actions amounted to the supervisor's violation of the Constitution.  The Supreme Court expressly rejected the argument:

> Respondent's conception of "supervisory responsibility" is inconsistent with his accurate stipulation that petitioners may not be held responsible for the misdeeds of their agents.  In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of their servants – the term "supervisory liability" is a misnomer. Absent vicarious liability each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.

*Iqbal*, 556 U.S. at 677.

The Fourth Circuit has established a three-part test for holding supervisory officials individually liable under § 1983: (i) the supervisor must have actual or constructive knowledge that his subordinate was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to citizens like plaintiff, (ii) the supervisor's response to that knowledge must be so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices" and (iii) there must be an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the Plaintiff.  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

> Under the first prong of *Shaw,* the conduct engaged in by the supervisor's subordinates must be **pervasive,** meaning that the **"conduct is widespread, or at least has been used on several different occasions."**  Furthermore, in establishing deliberate indifference under *Shaw's* second prong, a plaintiff ordinarily . . . **cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct**.  Deliberate

indifference, however, may be satisfied by showing a supervisor's continued inaction in the face of documented widespread abuses.

*Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (internal quotations and citations omitted).  Therefore, "in order to impute supervisory liability, the plaintiff must be able to identify a systematic practice . . . and that supervisors either encouraged the practice or did nothing to address it once they became aware of it."  *Climan v. Reeves,* No. 06-1099, 2007 WL 1815548, at *4 (E.D. Va. June 20, 2007).

Plaintiffs base their supervisory liability claim on an alleged failure of police officers to intervene to stop counter-protestors and, thus, permit the UTR rally to proceed.  For the reasons stated above, inaction on the part of law enforcement cannot support a claim since there is no constitutional right to be protected.  *See supra* Part III.D.2.  Moreover, even if Chief Thomas was aware of an alleged failure to intervene on the part of a subordinate officer, he cannot be held liable since such a failure to intervene does not rise to the level of a constitutional injury as discussed *supra*.  *Id.*  Therefore, the Third Cause of Action should be dismissed with prejudice.

**G.**     **Chief Thomas is entitled to qualified immunity**

Chief Thomas is entitled to qualified immunity as to all claims asserted by Plaintiffs, because he did not violate a clearly established right.  Qualified immunity provides immunity from suit rather than a mere defense to liability.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). **Thus, it should be resolved at the earliest possible stage of litigation.**  *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987) (emphasis added).  Indeed, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial."  *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017). **The safe harbor of qualified immunity ensures that public employees will not be liable for bad guesses in gray areas, but only for transgressing bright lines.**  *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (emphasis added).

The Supreme Court has outlined a two-pronged test governing qualified immunity.  The first prong considers whether the facts, viewed in the light most favorable to the plaintiff, make out a violation of a Constitutional right.  If they do, the second prong considers whether the constitutional right in question was "clearly established" at the time of the defendants' alleged violation.  *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).  The Court has discretion to determine which prong to address first.  *Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009).

A clearly established right is not discussed in a generalized fashion, but instead must be defined at a high level of particularity.  *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003).  **The Supreme Court recently reiterated that "clearly established law must be 'particularized' to the facts of the case . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."**  *White*, 137 S. Ct. 548, 552 (2017) (emphasis added).

> Just recently, the Supreme Court held that,
>
> [A] court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted.  If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—*i.e.,* if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

For the reasons stated *supra*, the allegations in the Amended Complaint do not set forth a Constitutional violation.  As such, the qualified immunity inquiry can end without addressing the second prong.  Nevertheless, it was not clearly established in August 2017 that Chief Thomas would violate Plaintiffs' Constitutional rights by declaring an unlawful assembly in the wake of violence and fighting amongst protestors and counter-protestors, and dispersing the entire crowd.

As such, Chief Thomas is entitled to qualified immunity and the Amended Complaint against him should be dismissed with prejudice.

## IV.    CONCLUSION

For all of the foregoing reasons, Al Thomas, by counsel, respectfully requests that this Court grant his Motion to Dismiss and dismiss the Amended Complaint against him with prejudice.

**AL THOMAS**

By Counsel

 s/David P. Corrigan
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Attorney(s) for Al Thomas
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

## C E R T I F I C A T E

I hereby certify that on the 19th day of February, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Elmer Woodard, Esq.
Attorney at Law, P.C.
5661 US Hwy. 29
Blairs, VA 24527
434-878-3422 - Phone
434-793-0675 - Fax
isuecrooks@comcast.net

James E. Kolenich, Esq.
Kolenich Law Office
9435 Waterstone Boulevard
#140
Cincinnati, OH 45249
513-444-2150 - Phone
5132976065 - Fax
jek318@gmail.com

Richard H. Milnor, Esq.
VSB No. 14177
Zunka, Milnor & Carter, Ltd.
P.O. Box 1567
Charlottesville, VA 22902
434-977-0191 x34 - Phone
434-977-0198 - Fax
RMilnor@zmc-law.com

Marshall H. Ross, Esq.
Erin R. McNeil, Esq.
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219
804-786-0046 – Phone
804-646-3500 – Phone
804-371-2087 – Fax
mross@oag.state.va.us
emcneil@oag.state.va.us

s/David P. Corrigan
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
 (VSB No. )
Attorney(s) for Al Thomas
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com