IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JASON KESSLER
and NATIONAL SOCIALIST
MOVEMENT and TRADITIONALIST
WORKER'S PARTY,

     *Plaintiff,*

v.                Civil Action No. **3:18CV00107**

CITY OF CHARLOTTESVILLE, VIRGINIA,
AL THOMAS; BECKY
CRANNIS-CURL,

     *Defendants*.

## CITY OF CHARLOTTESVILLE'S
## BRIEF IN SUPPORT OF MOTIONS TO DISMISS

Comes now the City of Charlottesville and submits the following brief in support of its Rule 12(b)(1) F.R.C.P. and Rule 12(b)(6) F.R.C.P. Motions to Dismiss Jason Kessler ("Kessler"), National Socialist Movement ("NSM"), and Traditional Worker's Party ("TWP") Amended Complaint.

## INTRODUCTION

In 1982, the United States Supreme Court reaffirmed in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) that "the First Amendment does not protect violence" citing Justice Douglas' concurring opinion in *Samuels v. Mackell*, 401 U.S. 66, 75, as apt to the August 12, 2017 rally, the Court stated that, "Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy." The Amended Complaint fails to state a plausible claim of any First Amendment or Fourteenth Amendment deprivation properly attributable to the City of Charlottesville as a result of a policy/order.

## FACTS ALLEGED

Kessler, NSM, and TWP allege that after a July 8, 2017 Ku Klux Klan (KKK) rally at which the Charlottesville police had to form a picket line to allow KKK members to enter and then exit (¶17) the police had to declare an unlawful assembly in order to be able to forcibly clear garage exits so KKK members could exit (¶¶22 & 23). Kessler Plaintiffs allege that following that experience, then Charlottesville Chief of Police Al Thomas, Jr. stated that he was not going to get protesters in and out during the August 12, 2017 Unite the Right (UTR) rally. The Plaintiffs claim that prior to the August 12, 2017 Unite the Right rally that Defendants had intelligence that violent counter-protesters would attend the rally and planned violence in an attempt to impose what they argue is a heckler's veto (¶58). In preparation for the rally, the Kessler Plaintiffs claim that the Charlottesville Police were simply ordered not to actively engage in "every little thing" (¶53); not to go in and "break up fights" (¶53); and not to interrupt "mutual combat" (¶57) and were warned not to go among the crowd where they might get hurt. Kessler, NSM, and TWP allege in the Amended Complaint that on August 12, 2017 prior to the beginning of the Plaintiffs' rally that Chief Thomas was advised that fights were occurring apparently between Kessler's "right" rallyers and counter-protesters. Plaintiffs allege Chief Thomas issued a non-intervention order to the Charlottesville Police Department officers present to "Let them fight, it would make it easier to declare an unlawful assembly" (¶¶36 & 50). Kessler and his fellow Plaintiffs admit that as a result of the violent fighting between the protesters and Unite the Right groups, an unlawful assembly was declared by the police which applied **equally** to Kessler, NSM, TWP, and its members and the counter-protesters (¶56).

## STANDARD OF REVIEW

### 1. Rule 12(b)(1) Motion to Dismiss.

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal of a claim when the Court lacks subject matter jurisdiction over the action. A motion to dismiss for lack of standing is proper pursuant to Rule 12(b)(1), because, absent standing, a court lacks subject matter jurisdiction. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). NSM and TWP bear the burden of production and burden of establishing standing under Article III of the U.S. Constitution to invoke Federal jurisdiction. *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 561 (1992); *Stephens v. County of Albemarle, Va.*, 524 F.3d 485, 491 (4th Cir. 2008). The manner and degrees of evidence required increases at each stage of the pleadings. *Stephens* at 491. In deciding a Rule 12(b)(1) motion to dismiss, the Court may consider evidence outside of the pleadings without converting the proceeding to one for summary judgment. *Richmond, Fredericksburg & Potomac R. Co.*, 945 F.2d 765, 768 (4th Cir. 1991).

### 2. Rule 12(b)(6) Motion to Dismiss.

In order to survive a Rule 12(b)(6) motion, the Plaintiffs' Amended Complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face'". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Amended Complaint's factual allegations must produce an inference of liability strong enough to push the Plaintiffs' claims "across the line from conceivable to plausible". *Iqbal* at 683. Under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), not only must the Amended Complaint contain facts sufficient to state a claim for relief that is plausible on its face, the Amended Complaint's "factual allegations must be enough to raise a right to relief above the speculative level". *Twombly* at 555. When a complaint pleads facts that are merely "consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility

3

of entitlement to relief". *Twombly* at 557. In *Iqbal*, the United States Supreme Court stated that two working principles underlie its earlier decision in *Twombly*. While a court reviewing a Rule 12(b)(6) motion must accept as true all of the factual allegations contained in a complaint, **it is not bound to accept legal conclusions, including those couched as factual allegations.** (emphasis supplied) *Iqbal* at 679. Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal* at 679; *Twombly* at 556. In determining whether a complaint states a plausible claim for relief, the court engages in a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense". *Iqbal* at 679. Finally, where actual "well pleaded facts" do not permit the Court to infer more than the mere "possibility of misconduct", the pleader is not entitled to relief. *Iqbal* at 679. Mere formulaic recitals of the elements of a cause of action supported by mere conclusory statements do not suffice to state a plausible claim for relief. *Iqbal* at 678.

## ARGUMENT

## RULE 12(b)(1) F.R.C.P. MOTION TO DISMISS

The requirement that jurisdiction and standing under Article III of the U.S. Constitution be established as a threshold matter springs from the nature and limits of judicial power. *Daimler Chrysler Corp. v. Cono*, 547 U.S. 332, 340 (2006). There are three elements to establish constitutional standing:

> First, the plaintiff must have suffered an "injury in fact" –an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not conjectural or hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative" that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction bears the burden of establishing standing. *Id* at 561; *Stephens v. Cty of Albemarle, Va.*, 524 F.3d 485,

491 (4th Cir. 2008). An association has standing to sue on behalf of its members if they would have standing to sue on their own, the association seeks to protect interests germane to its purpose, and neither the claim asserted nor the relief requested requires its individual members to participate in the lawsuit. *Hunt v. Walsh State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

In the Amended Complaint NSM and TWP allege only that they and their members were present and attempted to engage in political speech and expressive activities at UTR." (ECF Doc. 2, at ¶¶3-4.) The Amended Complaint does not identify any members from either corporate entity who were present. NSM and TWP then allege in limiting fashion that some but not all members apparently supported the rally ("or at least some members who wished to do so" *Id* at ¶12). Plaintiffs do not allege that NSM or TWP as corporations suffered an injury or a violation of their organizations' constitutional rights in their own right and do not have entity standing based on the allegations in the Amended Complaint. *Southern Walk at Broadlands Homeowners Association Inc. v. Openband at Broadlands, LLC,* 713 F.3d 175 (4th Cir. 2013). A mere interest in a problem is not sufficient to confer standing on an organization. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

NSM and TWP apparently are staking any claim to standing only on "representational standing". NSM and TWP have not alleged facts sufficient to show that they have representational standing to assert claims against Defendants. NSM and TWP have not identified any members that were present at the UTR rally and denied the opportunity to speak. They only assert generally that "members were present and attempted to engage in political speech and expressive activities" but do not identify any of those individuals. (ECF Doc. 2, at ¶¶3-4.) Plaintiffs assert only that they wished to hear Kessler "and the other scheduled speakers and publicly demonstrate support for them in the face of anticipated counter protests." (*Id.* at ¶13.) Since the Amended Complaint fails to make specific allegations establishing that at least one **identified member** had suffered harm neither

5

corporate entity has representational standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

NSM and TWP lack standing to pursue their claims against Defendants, and their claims should be dismissed for lack of subject matter jurisdiction.

### RULE 12(b)(6) F.R.C.P. MOTION TO DISMISS

**1. THE AMENDED COMPLAINT'S "FIRST CAUSE OF ACTION" FAILS TO STATE A CLAIM OF A FIRST AMENDMENT VIOLATION. IT IS AXIOMATIC THAT THE FIRST AMENDMENT DOES NOT PROTECT VIOLENCE. THE ALLEGED NON-INTERVENTION/MONITORING ORDER AND DECLARATION OF UNLAWFUL ASSEMBLY, APPLIED EQUALLY TO BOTH THE "RIGHT" PLAINTIFFS AND PROTESTERS AND DOES NOT CONSTITUTE A SO-CALLED HECKLER'S VETO.**

In *Sines v. Kessler*, 324 F.Supp.3d 765 (W.D.Va. 2018) this Court cited the *Claiborne Hardware Co.* opinion which stated that "the First Amendment does not protect violence", *Claiborne* at 916, and denied in large part a Motion to Dismiss by now Plaintiffs Jason Kessler, National Socialist Movement, and Traditionalist Worker's Party who are just three of a number of individual and entity defendants in *Sines*. This Court rejected Kessler, NSM, and TWP's First Amendment "advocacy" argument as a defense to the Motion to Dismiss they raised to claims from individuals injured on August 12, 2017. In doing so, this Court noted as apt to this case that, "In 1871, Congress passed a law 'directed at the organized terrorism in the Reconstruction South'". *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600 (1979); *see* 42 U.S.C. §1985. Over 140 years later, on August 11th and 12th, 2017, the Defendants (including the three plaintiffs in this case in this lawsuit) including the Ku Klux Klan, various neo-Nazi organizations, and associated white supremacists, held rallies in Charlottesville, Virginia. **Violence erupted.** *Sines at 773*. The violence that erupted involved the rally attendees. Subsequent to this Court's ruling against them in *Sines*, Kessler, NSM, and TWP filed the Amended Complaint in this case.

Chief Thomas' non-intervention policy/order Plaintiffs allege applied equally according to the Amended Complaint to the "right" Plaintiffs and counter-protesters. The declaration of an Unlawful Assembly pursuant to §§18.2-406 & 407 Va. Code Ann. (1950) necessitated by the escalating violence observed by the CPD and the VSP does not constitute a so-called "heckler's veto" policy. It applied equally to the UTR attendees and counter-protesters and required them all to disperse from the scene. before the speaking even began. Section 18.2-406 Va. Code Ann. (1950) provides that:

> Whenever **three or more persons** assembled share **the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order, and the assembly actually tends to inspire persons of ordinary courage with well-grounded fear of serious and immediate breaches of public safety, peace or order, then such assembly shall be guilty of a Class 1 misdemeanor.** If any such person carried, at the time of his participation in an unlawful assembly, any firearm or other deadly or dangerous weapon, he shall be guilty of a Class 5 felony. (emphasis supplied)

Following the declaration of an unlawful assembly pursuant to §18.2-407 Va. Code Ann. (1950), Kessler, NSM, and TWP as well as the counter-protesters were all required to disperse. The First Amendment right to free speech and association was temporarily restrained– constitutionally for all who were present. In *United Steelworkers of America AFL-CIO-CLC v. Dalton*, 544 F.Supp. 282 (E.D.Va. 1982) Judge MacKenzie upheld the constitutionality of §18.2-406 and §18.2-407 against a First Amendment facial challenge. In doing so the Court stated that the language of §18.2-406 closely follows the common law definition of unlawful assembly. The Court noted that the definition requires the existence of circumstances evidencing a present threat of violence or breach of public order. He observed that there is no doubt that the states retain the right to maintain public order and noted that "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or

other immediate threat to public safety, peace, or order appears, the power of the state to prevent or punish is obvious." *Cantwell v. Connecticut*, 310 U.S. 296 (1940). In *Dalton*, the district court found that §18.2-406 does no more than exercise that power and that on its face §18.2-406 does not impermissibly infringe upon First Amendment rights. In *Dalton*, the Court further found that §18.2-407, which required all persons present including equally the Kessler, NSM, and TWP "right" and counter-protesters to disperse from the scene does not violate the First Amendment, concluding that "Thus before §18.2-407 can be invoked, the public peace and order must be in jeopardy. At such a time, it is not unreasonable to authorize the police to clear the streets. This is not a long-term measure. Once order is restored, those engaged in lawful activity may return to the streets, but at the time of a disturbance, or when there is a clear and present danger of immediate disturbance, the Commonwealth requires that the police be able to take quick action. To require individual determinations of who is acting lawfully and who unlawfully would prove unduly burdensome." *Dalton* at 289.

In *Turner v. Al Thomas, Jr.*, 313 F.Supp.3d 704 (W.D.Va. 2018), this Court recently found that there is no constitutional duty under the Fourteenth Amendment for the police to affirmatively intervene to protect a citizen such as Kessler, NSM, and TWP, or as in *Turner*, a counter-protester, from criminal conduct by third parties. In *Turner*, this Court found that framing the incident in terms of a "stand down" order is no more than an "artful recharacterization" of inaction as action-and is something that the Fourth Circuit in *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) warned was inappropriate. The alleged "stand down" order in *Turner* was not a "state created danger". In this case, the Plaintiffs attempt to substitute a non-intervention/monitoring order/policy issued by the Chief of Police for a "stand-down order". This substitution is the functional equivalent of the "stand down" order which this Court has already concluded does not violate the Fourteenth Amendment due

process clause. Defendants submit that the First Amendment does not impose an affirmative duty in this case on the police to do something that the Fourteenth Amendment does not.

The alleged non-intervention/monitoring policy not to get involved and interfere with the rally and not to break up "mutual combat" (¶53) or "break up every fight" (¶53) does not constitute a so-called heckler's veto. It is readily distinguishable from the majority of the First Amendment heckler's veto policy cases which by their nature involve affirmative action by way of arrest or removal of only the unpopular speaker(s) at the expense of the hecklers. In *Bible Believers v. Wayne Cnty.*, 805 F.3d 228 (6th Cir. 2015), the Sixth Circuit in an *en banc* decision found a violation of the First Amendment through a heckler's veto. In *Bible Believers*, unpopular speakers confronted by a hostile crowd were singled out and silenced by removal and arrest, as an expedient alternative to containing or snuffing out the lawless behavior of rioting individuals. Unlike the facts in *Bible Believers* where only the speakers were the subject of an affirmative act, i.e., arrest, in this case Plaintiffs admit that both groups were treated equally under the non-intervention/monitoring limited action policy both prior to and after the Unlawful Assembly Declaration. In *Bible Believers*, only the speaker and not the hecklers were arrested. In *Bible Believers*, the Sixth Circuit found that that was a heckler's veto. *Bible Believers* is readily distinguished from this case. Following the unlawful assembly declaration, Kessler, NSM, and TWP and the other "right" attendees were also treated equally with the protesters. Neither was allowed to speak anymore following the lawful declaration of unlawful assembly due to violence. In *Bible Believers* the Sixth Circuit limited its holding by noting that the Constitution does not require that the officer "go down with the speaker". *Bible Believers* at 253. Plaintiffs request just that. In stating that when the police seek to enforce law and order they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens, as options, the Court noted that in terms of affirmative action as opposed to inaction, the police may go against hecklers,

9

cordon off the speakers (as alleged was done in this case in the Amended Complaint in ¶33 – "Charlottesville police divided the protest area up into 5 police zones.") or attempt to disperse the entire crowd if that becomes necessary (as was the case on August 12, 2017 when UTR "speakers" and "hecklers" were treated equally by the Unlawful Assembly Declaration.) *Bible Believers* at 253. Unlike the fact pattern in *Bible Believers* which involved affirmative action of the police to only remove the unpopular speaker in order to restore peace which constitutes a heckler's veto, in this case the Amended Complaint on its face deals with violence by the UTR Plaintiffs and the counter-protester "hecklers". The mutual combat and violence which resulted in an unlawful assembly declaration equally curtailed any first amendment rights temporarily. Defendants submit for the same reasons that in *Turner* this Court found that Chief Thomas' alleged stand-down policy and action did not state a Fourteenth Amendment due process claim that the same inaction, non-intervention, monitoring alleged plan did not violate the First Amendment and is simply not any "heckler's veto".

2. **THE AMENDED COMPLAINT'S "SECOND CAUSE OF ACTION" FAILS TO ALLEGE A PLAUSIBLE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE VIOLATION PROPERLY ATTRIBUTABLE TO THE CITY OF CHARLOTTESVILLE.**

In *Turner v. Al Thomas, Jr.*, 313 F.Supp.3d 704, 716 (W.D.Va. 2018), this Court found that the alleged "stand down" order/policy pled in that case by that same Co-defendant Al Thomas, the former Chief of Police, which Plaintiffs now allege is equivalent to a "heckler's veto policy", did not state a plausible claim of a substantive due process violation of the Fourteenth Amendment against either Thomas or the City of Charlottesville under *Monell*. The Court's rationale in *Turner* is equally applicable in this case despite Plaintiffs' attempt to cast the *Turner* claimed "stand down" order into a "heckler's veto" policy and does not state a plausible claim of a violation of the Fourteenth Amendment's equal protection clause since the "policy/order" applied equally to Plaintiffs "right" UTR rallyers and the counter-protesters.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall…deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. Amend. XIV, §1*. The equal protection requirement "does not take from the States all power of classification," *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 271 (1979), but "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

Thus, "[t]he [Equal Protection] Clause requires that similarly-situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). In order to make out a claim under the Equal Protection Clause, a plaintiff must demonstrate that he has been treated differently from others similarly situated and that the unequal treatment was the result of intentional discrimination. *Sandlands C&D LLC v. County of Horry*, 737 F.3d 45, 55 (4th Cir. 2013) (holding that there is no equal protection claim where the plaintiff does not establish that he was treated differently or subject to purposeful discrimination); *Morrison v. Garraghty*, 239 F.3d 648, 652 (4th Cir. 2001); *Brown v. Wilson*, No. 3:13CV599, 2015 WL 3885984, at *6 (E.D. Va. 2015); *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

A complaint that merely asserts that the plaintiff was treated differently from others without specifying how the others were similarly situated will be dismissed. *See, Nofsinger v. Va. Commonwealth Univ.*, 523 F.App'x. 204, 206 (4th Cir. 2013) (affirming dismissal of equal protection claim where plaintiff alleged she was treated differently from others, but failed to specify how the others were similarly situated). In the equal protection context, "similarly situated" means that the individuals "are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). To state an equal protection claim, a plaintiff

must adequately plead that the government treated the plaintiffs disparately as compared to similarly situated persons. *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).

The Amended Complaint in ¶¶71 & 73 only contains conclusory allegations of an equal protection violation and is insufficient as such to state a plausible claim of any constitutional violation. Plaintiffs claim in ¶72 that "by granting use of a public forum to people whose political views defendants find acceptable, but denying use to those expressing less favored or controversial views, such as those expressed by Plaintiffs, Defendants have violated the equal protection clause of the Fourteenth Amendment." The Amended Complaint fails to state a plausible claim of any equal protection violation. It fails to identify or specify how the two entities it's attempting to refer to were similarly situated and does not allege how they were "in all relevant aspects alike". Moreover, it fails to demonstrate how the different groups were treated differently from others similarly situated and that any unequal treatment was the result of intentional discrimination. The Amended Complaint in fact alleges that as a result of the Unlawful Assembly Declaration pursuant to §§18.2-406 and 407 Va. Code Ann. (1950) on August 12, 2017 both the Plaintiffs and the counter-protesters were treated equally, since pursuant to §18.2-407 the Kessler Plaintiffs and counter-protesters were temporarily both denied their First Amendment rights to speech and association. Moreover, prior to the Declaration having to be declared because of the violence, the monitoring/non-intervention "policy/order" treated both equally. To the extent Plaintiffs are referring to the allegations pertaining to the CPD actions with respect to the July 8, 2017 KKK rally they fail to allege how they were similarly situated and are in all respects alike.

The Amended Complaint fails to state a plausible Fourteenth Amendment equal protection underlying claim against Chief Thomas and without any undergirding violation it fails to state a *Monell* claim against the City of Charlottesville.

3. **THE AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE *MONELL* CLAIM AGAINST THE CITY OF CHARLOTTESVILLE SINCE IT FAILS TO STATE A PLAUSIBLE CLAIM OF AN UNDERGIRDING CONSTITUTIONAL VIOLATION BY CHIEF THOMAS.**

For a municipality to be liable under §1983, a plaintiff must demonstrate an underlying constitutional violation. *Waybright v. Frederick Cty. Md.*, 528 F.3d 199, 203 (4th Cir. 2008) "Municipalities cannot be liable under §1983 without some predicate "constitutional injury at the hands of the individual (state officer) at least in suits for damages." (quoting *City of Los Angeles v. Eller*, 475 U.S. 796, 799 (1986); *see also Stevenson, ex rel. Stevenson v. Martin Cty. Bd. of Educ.*, 3 Fed.Appx. 25, 33 (4th Cir. 2001) "An award of damages against a municipality based on the actions of its officers is not available unless the officers' conduct amounted to a constitutional injury.") In *Los Angeles County California v. Humphries*, 562 U.S. 29 (2010) the United States Supreme Court extended this rule to claims for prospective relief including declaratory or injunctive relief.

Here, as this Court previously concluded in *Turner v. Al Thomas, Jr.,* 313 F.Supp.3d 716 (W.D.Va. 2018), since Co-defendant former Chief Al Thomas is again entitled to qualified immunity under <u>both</u> prongs of the qualified immunity test for the reasons asserted by Co-defendant Thomas in his Motion to Dismiss and supporting brief filed in this case on the issue of the sufficiency of the Complaint to state a plausible claim of a constitutional deprivation (which are incorporated herein) no constitutional violation is stated in the Amended Complaint against Al Thomas, Jr., and therefore no *Monell* claim is stated against the City. With no undergirding constitutional violation in this case by Chief Thomas of Plaintiff's First Amendment and Fourteenth Amendment rights, the City simply has no §1983 municipal liability under *Monell*.

4. **THE AMENDED COMPLAINT ALSO FAILS TO STATE A PLAUSIBLE *MONELL* CLAIM AGAINST THE CITY OF CHARLOTTESVILLE SINCE IT FAILS TO ALLEGE AGAINST THE CITY A MUNICIPAL "POLICY OR CUSTOM" ESTABLISHED BY THE CITY OFFICIAL CHARGED UNDER VIRGINIA LAW IN THE CITY'S CHARTER WITH FINAL POLICY MAKING AUTHORITY IN THE AREA WHICH IS THE SUBJECT OF THE AMENDED COMPLAINT.**

Plaintiffs attempt to state a municipal liability claim against the City of Charlottesville under *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-691 (1978). It is axiomatic that under *Monell* the City as a municipality cannot be held liable under §1983 on a respondeat superior theory for claimed misconduct by its former employee, the Chief of Police. *Monell*, 436 U.S. at 691. In the Amended Complaint, Plaintiffs base their attempted *Monell* claim on allegations of "misconduct" (¶5) and policies/orders of its Police Chief on August 12, 2017. Plaintiffs assume that because Co-defendant Thomas was the Chief of Police at the time that he was "therefore a final policy maker" (¶6). The Amended Complaint alleges that former City of Charlottesville Police Chief Thomas was present on August 12, 2017 in his capacity as the Chief of Police. Plaintiffs further allege in conclusory fashion that then Chief Thomas was therefore "a final decision maker regarding law enforcement (¶34)." Plaintiffs allege that when Chief Thomas was advised that violence had broken out that he ordered Charlottesville police on the scene not to aggressively intervene, claiming that Thomas stated, "Let them fight, it will make it easier to declare an unlawful assembly" (¶¶36&50). Plaintiffs allege that the failure to intervene in ongoing violence by not engaging in "every little thing:, not "go in and break up fights", and not to interrupt "mutual combat" (¶53) on August 12, 2017 and "non-intervention order initiated by Chief Thomas" (¶46) was a "heckler's veto" policy. Despite this Court's previous ruling *Turner v. Al Thomas, Jr., et al*, 313 F.Supp.3d 704 (W.D.Va. 2018) that former Police Chief Thomas' alleged "stand down order" (which they now refer to apparently as a heckler's veto policy) did not violate the protesters' and counter-protesters' substantive due process

rights under the Fourteenth Amendment, Plaintiffs attempt to claim that essentially the same passive monitoring policy violates the First Amendment and Fourteenth Amendment equal protection clause.

As a matter of state law and public record, the City of Charlottesville Charter provides that the City has a City Manager form of government which this Court can take judicial notice of. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-7 (4th Cir. 2015). Pursuant to §5(b) of the City of Charlottesville Charter granted by the Virginia General Assembly, "The form of government for said City shall be the City Manager plan as follows 'All corporate powers, legislative and executive authority vested in the City of Charlottesville by law shall be and are hereby vested in a Council of five members to be elected at large from the qualified voters of the City except as hereinafter provided". In §5(f), the Charter specifically provides, that subject to the general control of Council, that, "The City Manager shall have full executive and **administrative authority** and shall have the right to employ and discharge all employees under his control". (Emphasis supplied.) The subsection goes on to specifically provide that, "All departments of the City Government, including … **the police department shall be under the general supervision of the City Manager**". (Emphasis supplied.) Pursuant to §2-146 of the Charlottesville City Code, the City Manager is the Chief Executive and Administrative Officer of the City Government and is in charge of enforcing the laws of the City. The City Manager is the Director of Public Safety, with general supervision over the Police Department of the City and its Chief of Police.

The Amended Complaint does not allege that the City Manager, to whom by law former Chief Thomas reported, ever reviewed or approved the non-intervention so called "heckler's veto" policy that Chief Thomas allegedly instituted in conjunction with Co-Defendant Flaherty from the Virginia State Police or that Chief Thomas was "the final policy maker" for the City of Charlottesville.

15

Under *Monell v. New York Department of Social Services,* 436 U.S. 658 (1978), the City of Charlottesville cannot be held liable under the theory of *respondeat superior* §1983 for constitutional violations caused by any of its employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). Under *Monell*, it can only be liable if the municipality causes a constitutional tort "through an official policy or custom". *Pachaly v. City of Lynchburg,* 897 F.2d 723 (4th Cir. 1990); *Pembaur* at 477. In *Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003), the Fourth Circuit noted that, "A policy or custom for which a municipality may be held liable in a §1983 action can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with **final policy making authority**; (3) through an omission such as a failure to properly train officers, that 'manifest deliberate indifference to rights of citizens'; or (4) through a practice that is so 'persistent and widespread' to constitute a 'custom or usage with the force of law'". (Emphasis supplied.) *Lytle* at 471; see also *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-125 (1988). Under the facts pled by Kessler, NSM, and TWP in their Amended Complaint, the only potential path to a *Monell* claim against the City of Charlottesville is through the second method set forth in *Lytle* since Plaintiffs do not allege any express policy, written ordinance or regulation. Plaintiffs do not allege in their Amended Complaint that the City Manager either supervised, approved, or delegated to Chief Thomas the authority to establish as the final policy maker whatever policy under which they attempt to attribute municipal liability under *Monell* to the City of Charlottesville. They never allege that the police chief was **the** final policy maker under state law. See *Stickley v. Sutherly,* 416 Fed.Appx. 268 (4th Cir. 2011) (finding no municipal liability under *Monell* where Plaintiff failed to show that the police chief or city manager had final authority under the Strasburg Town Code to establish municipal policy with respect to the action ordered). Under *Pembaur*, municipal liability only attaches where the decision maker possesses **final authority** to establish municipal policy with respect to the action

ordered and resolution of that issue is governed by state law. *Pembaur* at 481-483. Pursuant to the City of Charlottesville Charter, the City Manager, not the Police Chief, is the **final authority**.

In *Cranford v. Kluttz,* 278 F.Supp.3d 848, the district court noted, citing *Lytle*, that municipal liability may only arise through decisions of a person with final policy making authority. The district court, in *Cranford*, citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-125 (1988), noted again that the identification of policymaking officials is a question of state law. The Court then went on to note, such as the case here, that, "If an official's acts are subject to review or supervision by a municipal policy maker, that official does not have final policymaking authority". *Alexander v. City of Greensboro*, 762 F.Supp.2d 764, 783 (M.D.N.C. 2011) (citing *Riddick v. Sch. Bd.*, 238 F.3d 518, 523-524 (4th Cir. 2000)). In *Alexander*, the District Court held that, "While it is true that Plaintiffs only need to establish a prima facie case at this stage, *Iqbal* and *Twombly* require more than claims from which mere possibility can be inferred; they require facts showing plausibility. Plaintiffs have not met this standard. See *Yadin Co. v. City of Peoria,* No. CV-06-1317-PHX-PGR, 2008 U. S. Dist. LEXIS 109501, 2008 WL 906730, at (D. Ariz. Mar. 25, 2008) (dismissing section 1983 claim for lack of factual allegations supporting plaintiff's assertion that a city official had final policymaking authority or had been delegated such authority.)

Pursuant to the City of Charlottesville Charter, Thomas's claimed policy/order, even if it violated the First Amendment or Fourteenth Amendment (which, as previously argued in this brief and Co-defendant Thomas' incorporated argument on this issue, does not), also cannot subject the City of Charlottesville to potential liability under *Monell* since, under the Charlottesville City Charter, Chief Thomas' alleged policy/order was subject to review and supervision by the City Manager. He did not have final policymaking authority; and the police chief's alleged policy/order is not actionable against the City under *Monell*.

Wherefore, the City of Charlottesville, Virginia requests that the Court dismiss all claims against it in the Amended Complaint.

CITY OF CHARLOTTESVILLE, VIRGINIA
By Counsel

s/Richard H. Milnor
Richard H. Milnor, Esquire (VSB #14177)
Zunka, Milnor & Carter, Ltd.
414 Park Street
P O Box 1567
Charlottesville VA 22902
Telephone: (434) 977-0191
Facsimile: (434) 977-0198
rmilnor@zmc-law.com

s/John C. Blair, II
John C. Blair, II (VSB #65274)
Charlottesville City Attorney
605 East Main Street-City Hall
Charlottesville, VA 22902
Telephone: (434) 970-3131
Facsimile: (434) 970-3022
blairjc@charlottesville.org

*Counsel for the City of Charlottesville*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February, 2019, I electronically filed the foregoing City of Charlottesville's Brief in Support of Motions to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/Richard H. Milnor