IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JASON KESSLER, *et al.*,

    Plaintiff,

v.

CITY OF CHARLOTTESVILLE, *et al.*,

    Defendants.

Civil Action No. 3:18-cv-00107

**DEFENDANT CRANNIS-CURL'S**
**<u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

    Plaintiff Jason Kessler organized the Unite the Right Rally on August 12, 2017 to protest the removal of a statue of Confederate General Robert E. Lee from Emancipation Park in Charlottesville. (Dkt. No. 2, ¶¶ 10, 58.) Plaintiffs, the National Socialist Movement and the Traditionalist Worker's Party planned to participate. (*Id*. at ¶¶ 2, 3.) Violence broke out and, ultimately, the rally was declared an unlawful assembly. (*Id*. at ¶ 55.) Because the rally was halted, Plaintiffs were not able to speak at or participate, (*id*. at ¶ 56), and claim that they were "forced to defend themselves from physical violence wrongfully perpetrated by violent counter protestors," (*id*. at ¶ 55). In their Complaint, Plaintiffs allege three counts pursuant to 42 U.S.C. § 1983 stemming from their account of the rally's disruption. Specifically, Plaintiffs claim that: (1) their First Amendment right to police protection from private citizens whose actions are impeding their ability to speak publicly was violated, (*id.*, Count I, ¶¶ 63-69); (2) they were denied equal protection because they did not have equal access to speak at a rally in Emancipation Park as groups with "political views Defendants find acceptable," (*id.*, Count II, ¶¶ 70-74); and (3) Defendant Crannis-Curl, a Lieutenant for the Virginia state Police, has

supervisory liability for police officers under her command who did not stop "hecklers" from impairing Kessler's right to speak publicly, (*id.*, Count III, ¶¶ 75-79).

Defendant Lieutenant Crannis-Curl is entitled to dismissal with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). None of these allegations has an adequate basis in law or fact. Although the First Amendment right to freedom of speech prohibits the government from placing content-based restrictions on speech, citizens do not have a right to governmental protection from other citizens disrupting their speech. The allegation of unequal treatment by law enforcement is without factual support. Indeed, Plaintiffs were granted use of Emancipation Park and, as the Complaint admits, the police broke up the violence and treated all present equally—"law enforcement moved in, broke up the fighting and declared an unlawful assembly, this time not just against violent counter-protestors as on July 8th, but against *everybody*." (*Id*. at ¶ 55 (emphasis added).) The only disparate treatment alleged in the Complaint is by Charlottesville Police officers responding to violence at a prior KKK rally, not any prior actions taken by Lieutenant Crannis-Curl. Finally, no cause of action for supervisory liability exists when the acts by the officers under a defendant's command were lawful and constitutional. Because the Complaint fails to state a cause of action pursuant to 42 U.S.C. § 1983, this case should be dismissed with prejudice, just as this Court dismissed a similar lawsuit brought pursuant to 42 U.S.C. § 1982 when it was brought by one of the people protesting Plaintiffs' rally. *Turner v. Thomas,* 313 F. Supp. 3d 704 (W.D. Va. May 29, 2018).

## FACTS AS ALLEGED IN THE COMPLAINT

Kessler organized the Unite the Right to take place on August 12, 2017, to protest the removal of a statue of Confederate General Robert E. Lee from Emancipation Park in Charlottesville. (Dkt. No. 2, ¶¶ 10, 58.) Plaintiffs, the National Socialist Movement and the

2

Traditionalist Worker's Party, also planned to participate. (*Id*. at ¶¶ 2, 3.) Plaintiff Kessler, the organizer, sought the permit from the City of Charlottesville to hold the rally. (*Id.* at ¶ 11).

The Unite the Right rally was not the first rally organized in Charlottesville to protest the removal of the Lee statue. A month before the planned United the Right rally, the KKK held a rally that dissolved into violence. (*Id*. at ¶¶ 15-23.) After the KKK rally, the citizens of Charlottesville were concerned about violence at the Unite the Right rally, particularly with credible threats of violence by groups in the weeks before. (*Id.* at ¶ 58.) In light of the public concern and the fear of violence, the City of Charlottesville revoked Kessler's permit to hold the Unite the Right rally in Emancipation Park. (*Id*. at ¶ 30.)

Plaintiff Kessler brought a suit separate from the instant case pursuant to 42 U.S.C. § 1983 to have his permit restored. (Dkt. 2, ¶¶ 30-31.); *Kessler v. City of Charlottesville, Va.*, Civil Action No. 3:17cv00056, 2017 U.S. Dist. LEXIS 128330 (W.D. Va. Aug. 11, 2017).[1] The suit named the City of Charlottesville and Maurice Jones as the defendants, because the City and its manager were the parties with authority over issuing and revoking Kessler's permit.[2] *Id.* at *1-

---

[1] "While a 12(b)(6) motion focuses on the allegations of the complaint, it is well-established that a document to a motion to dismiss may be considered when evaluating a motion to dismiss if the document was 'integral to the complaint and authentic.'" (*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) (quoting *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). Moreover, "when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint . . . not only documents quoted, relied upon, or incorporated by reference in the complaint, but also official public records pertinent to the plaintiff's claims." *Gasner v. Cty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995); *see Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking judicial notice of items in the public record."); *see also Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x. 395, 396-97 (4th Cir. 2006) (observing that a court may consider, on a 12(b)(6) motion, authenticated public records not attached to the complaint, without converting it to a motion for summary judgment).

[2] Chief Turner and Lieutenant Crannis-Curl, however, were not parties because they had no authority to issue or revoke Kessler's permit. Plaintiffs the National Socialist Movement and

*2. Kessler's suit was ultimately successful in restoring his permit to hold the Unite the Right Rally in Emancipation Park. *Id.* at * 9.

The rally proceeded as scheduled and, as anticipated, violence broke out. (Dkt. No. 2, ¶ 36.) Plaintiffs claim that after counter-protestors blocked the entrance to Emancipation Park, rally attendees "were forced to defend themselves from physical violence" and refer to this violence as "fighting" and "mutual combat." (*Id*. at ¶¶ 50, 53-56.) Because rally attendees were engaged in violent fights, purportedly in order to defend themselves, Plaintiffs claim that they were unable to "peacefully rally," speak as they planned, or hear other speakers. (*Id*. at ¶ 56.)

Plaintiffs allegations focus on a claim that Lieutenant Crannis-Curl and other law enforcement officers did not "send 'arrest teams' into the street" to break up fights between attendees and counter-protestors. (*Id.*at ¶ 40.) As part of these allegations, Plaintiffs state that: (1) Virginia State Police troopers on the scene told Charlottesville police officers that they would not "engage the crowd 'if safety was compromised,'" (*id.*at ¶ 42); (2) Virginia State Police troopers told Charlottesville police officers and citizens that they were ordered not to intervene in the fighting, (*id.*); and (3) Charlottesville police officers made statements indicating they would not interrupt "mutual combat" for fear that officers "might get hurt" in the violent crowd (*id*. at ¶ 53).

Plaintiffs also allege that Charlottesville police officers took a more active role to control counter-protestors at a KKK rally that occurred a month earlier, but without real success. (*Id.* at ¶¶ 15-24.) Despite police protection and efforts, both the police and KKK attendees were assaulted at the KKK rally. (*Id.* at ¶ 18.) Police officers were assaulted with "tomatoes and water bottles and spit on" while trying to protect the KKK. (*Id.* at ¶ 19.) And, even with

---

the Traditionalist Worker's Party were also not parties to that suit as they lacked standing to challenge the revocation of the permit.

Charlottesville police officers forming a corridor to escort the KKK out of the rally, counter-protestors were successful in blocking the KKK from exiting a parking garage, until their protest was declared unlawful and they were forcibly removed. (*Id.* at ¶ 23.)

Not only were the Charlottesville police unable to safeguard the KKK despite their efforts, but community members expressed concern after the KKK event that the police were "too harsh" in their treatment of counter-protestors. (*Id*. at ¶ 27.) Plaintiffs did not elaborate on the State's constitutional duties to the counter-protestors, but their single allegation in Paragraph 27 acknowledges that there is a tension that state and local officials have to balance between the rights of protestors and counter-protestors when implementing a plan to respond to a public rally that turns violent. (*See id*.)

Plaintiffs premise their civil rights claims on the alleged basis that both state and local law enforcement officers at the rally failed in their constitutional duties to ensure that Unite the Right attendees had perfect protection to exercise their First Amendment rights and that they should be guaranteed equal access to public forums. (*Id*. at ¶¶ 66, 72.) Yet, they simultaneously allege that it was impossible for local police to fulfill those duties at an earlier rally. (*Id.* at ¶¶ 18-23.) Furthermore, there are no actual allegations made against Lieutenant Crannis-Curl: she did not make any decisions with regard to granting or revoking access to a public forum and Plaintiffs acknowledge the decisions that were within her authority were based upon a risk assessment of the conditions at the rally, not on the viewpoints of Plaintiffs. (*Id.* at ¶ 42.) Therefore, the Complaint's alleged facts directly contradict the alleged legal conclusions and the Complaint should be dismissed with prejudice.

## LEGAL STANDARD

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) requires that a complaint state on its face a "plausible" claim. The Supreme Court of the United States held that district courts must examine a complaint to determine whether the plaintiff has alleged facts sufficient to make a particular cause of action plausible. *Id.* at 557. Specifically, although on a Rule 12(b)(6) motion all facts pled by a plaintiff are assumed to be true by the Court, a plaintiff must "provide the 'grounds' of his 'entitlement to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id*. at 555 (internal citation omitted). Thus, a complaint must provide defendants more than mere notice of those claims that a plaintiff may bring against them. A well-pled complaint will show why the plaintiff is entitled to relief, rather than just make a blanket assertion that the plaintiff's rights were violated:

> Rule 8(a)(2) still requires a 'showing', rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.

*Id*. at 554 n.3 (citing 5 *Wright & Miller* § 1202, at 94, 95). The "plausibility" standard set forth in *Twombly* requires more than a mere possibility that a defendant has acted unlawfully. *Id*. at 556.

## ARGUMENT

The Complaint fails the plausibility test set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and therefore should be dismissed for failure to state a claim upon which relief may be granted.

**I.     THE FIRST AND FOURTEENTH AMENDMENTS DO NOT REQUIRE THE GOVERNMENT TO PROTECT SPEAKERS FROM HECKLERS**

Plaintiffs premise their claim against Lieutenant Crannis-Curl on a theory that the First Amendment right to free speech includes a right to police protection from private citizens seeking to disrupt Plaintiffs' speech. (Dkt. No. 2, ¶¶ 64-69.) Plaintiffs assert this is a liberty interest applied to the states via the Due Process Clause of the Fourteenth Amendment. (*Id*. at ¶ 64.) The claim asserted by Plaintiffs is strikingly similar to the one asserted in this Court by plaintiff Robert Sanchez Turner, in which Turner brought suit against the City of Charlottesville, the chief of the Charlottesville Police Department, and the superintendent of the Virginia State Police alleging he had a constitutional right to police protection from violent protestors at the same UTR rally that is the basis for the instant case. *Turner v. Thomas,* 313 F. Supp. 3d 704, 710 (W.D. Va. May 29, 2018).

Turner alleged a due process right under the Fourteenth Amendment to be protected from harms by third parties that the police could have prevented. *Id.* In this case, Kessler and his co-plaintiffs allege a Fourteenth Amendment right to be protected from harm to Plaintiffs' free speech rights by third parties that the police could have prevented. (Dkt. No. 2, ¶ 66.) This Court held that Turner had no clearly established right to police protection from violence at the UTR rally and therefore, the law enforcement defendants had qualified immunity from Turner's claims. *Turner*, 313 F. Supp. At 712.

In both this case and in *Turner* the same legal principle applies—a citizen does *not* have a constitutional right to police protection from unlawful acts by private citizens. *See DeShaney v. Winnebago Cty. Dept. of Soc. Serv.*, 489 U.S. 189, 195 (1989) (holding that the Due Process Clause of the Fourteenth Amendment does not require government actors to protect affirmatively life, liberty, or property against intrusion by private parties) (emphasis added). In *DeShaney*, a father of a minor child was suspected of abusing the child by the Department of Social Services

(DSS). *Id.* at 192. Despite repeated investigations and noted suspicious injuries indicating likely abuse, the father retained custody of the child until one day he beat his son so severely as to cause the child to fall into "a life-threatening coma." *Id.* at 193. The child recovered consciousness, but suffered severe brain damage requiring institutional care for the rest of his life. *Id.*

The child and his mother brought suit against DSS, alleging that the Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *Id.* at 194 (alterations in the original). The plaintiffs in *DeShaney* alleged that the child had a liberty interest in "freedom from unjustified intrusions on personal security" and by "failing to provide him with adequate protection against his father's violence" the State failed to protect the child's liberty interest. *Id.* at 195 (internal quotations omitted). The Supreme Court of the United States held, however, that

> nothing in the language of the Due Process clause itself requires the State to protect the life, liberty, and property of its citizens against invasions by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot be fairly extended to impose an affirmative obligation on the State to ensure those interests do not come to harm through other means.

*Id.* The Court held that there simply is no right to government aid, not even when that aid is necessary to secure one's life, liberty interest, or property interest. *Id.* at 196. Finally, the Court held that because the Due Process Clause does not require States to aid their citizens in security their lives, liberty, or property, "it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 197.

In the instant case, Plaintiffs attempt to assert that the Fourteenth Amendment guarantees them a right to government assistance in securing the liberty interest protected by the First Amendment from intrusions by "hecklers." (Dkt. No. 2, ¶ 66.) The holdings of *DeShaney* and *Thomas*, however, run contrary to that claimed right. Because there is no right to police protection from private citizens even to protect a person's life, then there surely is no right to police protection to suppress "hecklers" that are preventing Plaintiffs from making speeches. Without a clearly established right to government aid, it follows that law enforcement officers, such as Lieutenant Crannis-Curl, cannot be held liable for failing to provide that aid.

## II.  THE PLAINTIFF HAS FAILED TO STATE A VALID EQUAL PROTECTION CLAIM

Plaintiffs allege that Defendants granted the use of Emancipation Park, a public forum, "to people whose political views [they] find acceptable" but deny use of the park "to those expressly less favored or more controversial views." (*Id*. at ¶ 72.) But Kessler already litigated his right to equal access of a rally permit in Emancipation Park in this Court prior to the rally occurring, against the City of Charlottesville. (*Id.* at ¶ 32.) Kessler prevailed and was issued a permit for the Unite The Right. (*Id.*) Kessler does not allege that Defendants violated this Court's order issued in *Kessler v. City of Charlottesville, Va.*, Civil Action No. 3:17cv00056, 2017 U.S. Dist. LEXIS 128330 (W.D. Va. Aug. 11, 2017). In the Memorandum Opinion, this Court simply enjoined the City of Charlottesville and City Manager Maurice Jones from "revoking the permit to conduct a demonstration at Emancipation Park on August 12, 2017." (*Id.* at *9.) It did not order the defendants in that case to provide Kessler or his rally attendees any particular police protection from disruptive counter-protestors. On the contrary, this Court acknowledged that no matter where the rally was held, there would be no way to "avoid a clash of ideologies or prevent confrontation between the two groups" of protestors. *Id.* at *7.

9

Regardless of the location on the issued permit, it would not be possible to "separate the two opposing groups." *Id.*

Although Plaintiffs fail to articulate a claim pursuant to the Equal Protection Clause against any Defendant, no allegations are made specifically against Lieutenant Crannis-Curl. She was not alleged to be responsible for or actually declaring either rally unlawful (and she was not). Indeed, she was not alleged to even have been involved with the KKK rally in any way. Instead, she is quoted as saying she was going "off-plan" due to concerns that "safety was compromised." (*Id.* at ¶¶ 40-42.) Those allegations contradict any implication that Lieutenant Crannis-Curl participated in a plan to deprive Plaintiffs of equal access to Emancipation Park based on the content of Plaintiffs' speech. On the contrary, they expressly allege that Lieutenant Crannis-Curl was not part of a coordinated and premediated plan, but that she made a judgment call about how to handle numerous fights around Emancipation Park contrary to a plan. (*Id.*) Plaintiffs also allege her decision not to send "arrest teams" out into the fighting groups of protestors was based at least in part in safety concerns. (*Id.*) Plaintiffs' allegations that officers at the earlier KKK rally were assaulted when they attempted to form a protective corridor around KKK members demonstrates that Lieutenant Crannis-Curl's safety concerns were real, immediate, and based on precedent of a rally only a month earlier in the same location. Therefore, there is no basis for asserting that Lieutenant Crannis-Curl was involved in any unlawfully disparate treatment of Plaintiffs seeking to access to Emancipation Park as a public forum and that her orders during the rally were not based on Plaintiffs' viewpoint but on unfolding conditions during the rally that implicated safety concerns for the officers under her command.

III.     **THE PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST CRANNIS-CURL FOR SUPERVISORY LIABILITY**

### A. Crannis-Curl Has No Liability For The Actions Of Private Citizens

Plaintiffs' final count in the Amended Complaint is entitled "Supervisory Liability" and includes the allegation that "Defendants Thomas and Crannis-Curl were both supervisors of police personnel on August 12, 2017." (*Id.* at ¶ 76.) The supervisory liability claim is based, however, on the allegation that Defendants Thomas and Crannis-Curl "could have and should have stopped, or tried to stop, the heckler's veto from occurring." (*Id.* at ¶ 77.) Plaintiffs' claim of supervisory liability thus appears premised on an allegation that Thomas and Crannis-Curl are liable in a supervisory capacity for the disruptive acts of private citizen "hecklers" who disrupted Plaintiffs' rally and prevented them from speaking.

Yet, case law in the Supreme Court of the United States, the Fourth Circuit, and Western District of Virginia is clear: police have no liability for the actions of private people that infringe on another citizen's civil rights. *DeShaney*, 489 U.S. at 203; *Pinder v. Johnson*, 54 F.3 1169, 1174 (4th Cir. 1995); *Turner*, 313 F. Supp. 3d at 714.

In *Pinder*, a plaintiff sought to hold a police officer liable for the murder of her three children after her ex-boyfriend murdered them. *Pinder*, 54 F.3 at 1174. The police officer had the ex-boyfriend in custody after he broke into her home and assaulted the plaintiff. *Id.* at 1172. The ex-boyfriend threatened to murder the plaintiff and her children and "had just been released from prison after being convicted of attempted arson" of the plaintiff's home ten months earlier. *Id.* The police officer assured the plaintiff that he would wait until the next day to swear out a warrant and therefore the ex-boyfriend would be detained overnight. *Id.* With this assurance, the plaintiff returned to work, leaving her children at home alone. *Id.* Breaking his express promise to the plaintiff, the police officer swore out a misdemeanor warrant that same evening, which allowed the ex-boyfriend to be immediately released from jail. *Id.* Upon his release, the

ex-boyfriend went directly to the plaintiff's home and set it on fire, killing the plaintiff's three children. *Id.*

The plaintiff brought suit against the police officer, alleging that he had a duty to prevent the harm that befell her and her children as a result of releasing her ex-boyfriend from jail. *Id.* The Fourth Circuit held that the police officer owed the plaintiff and her children no duty to protect them from the ex-boyfriend, despite the fact that the police officer made an express promise of protection upon which the plaintiff relied and despite the fact that the officer had the ex-boyfriend in his custody, which gave him an unusual amount of control over the ex-boyfriend's actions. *Id.* at 1175. Despite these circumstances, the Fourth Circuit held that the police owe citizens no duty of protection from the acts of other citizens, unless the State does something to increase the danger posed to potential victims. *Id.* The failed promise of police protection upon which a citizen relied is insufficient to meet the standard of increasing the danger, however. *Id.*

In this case, Plaintiffs allege that the police have a duty to protect them from disruption by other private citizens. Yet, they allege no basis for this duty. No special relationship existed between Plaintiffs and the police. On the contrary, Plaintiffs admit that leading up to the rally there was public concern that the police were "too harsh" in controlling counter-protestors in the past and Charlottesville attempted to revoke Kessler's permit to hold the rally. (Dkt. No. 2, ¶¶ 28-30.) Plaintiffs also had the vivid demonstration of the KKK rally a month before the planned UTR rally that despite police efforts, counter-protestors were able to assault KKK members (and the police) and block the KKK from exiting the rally. (*Id.* at ¶¶ 15-22.) Plaintiffs clearly had no promise by the police that police would successfully contain counter-protestors during the rally,

12

unlike the plaintiff in *Pinder*, who had an express promise her ex-boyfriend would remain in jail overnight.

Nor did the police have any control over the counter-protestors, unlike the dangerous ex-boyfriend in *Pinder*. The basis for Plaintiffs' Amended Complaint is that they had a right to assemble and speak in a public space. (Dkt. No. 2, ¶ 60.) But because it was a public space, anyone could access it, even without a permit. (*Id.*) With no control over Plaintiffs or the counter-protestors, there is no colorable claim that Crannis-Curl had "supervisory liability" for the acts of the private citizens at the rally.

### B. The Officers Under Her Command Did Not Violate The Plaintiff's Civil Rights

Plaintiffs also cannot state a claim for supervisory liability predicated on alleged constitutional violations by officers under Lieutenant Crannis-Curl's command. This Court already considered the question as to whether a commanding officer with the Virginia State Police had liability under 42 U.S.C. § 1983 for the inaction of VSP troopers at the UTR rally and held that there was none. *Thomas*, 313 F. Supp. 3d at 714-15. Citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), this Court held that for there to be supervisory liability, a plaintiff must show both that "the supervisor liability under § 1983 was clearly established at the time of the incident" and that "the underlying constitutional violation was also clearly established." *Id.*

This Court held that "there is simply no constitutional right to state protection from 'criminals or madmen,' and a state official's failure to provide such protection 'is not actionable under § 1983.'" *Id.* (quoting *Doe v. Rosa*, 795 F.3d 429, 440 (4th Cir. 2015)). Therefore, this Court held that a count for supervisory liability premised on the alleged inaction of VSP troopers at the UTR rally for failing to protect citizens at the rally from each other was barred by qualified immunity.

This Court's holding in *Thomas* should apply with equal force to the instant case. Plaintiffs complain that Virginia State Police troopers should have protected them not from just physical assault, like Thomas did, but also from interruption at their public rally. The legal principles, however, are the same. Troopers have no duty to protect citizens from "criminals or madmen," whether that protection is from violence or disruptive heckling. Therefore, Lieutenant Crannis-Curl has no supervisory liability because there was no underlying constitutional violation and the third count should be struck with prejudice from Plaintiffs' Amended Complaint.

C. **Crannis-Curl Has Qualified Immunity**

Crannis-Curl is sued in her individual capacity as a law enforcement officer who was in command of ground troops at the Unite The Right rally. (Dkt. No. 2, ¶ 7.) As a government official, she is entitled to qualified immunity unless her actions "violate clearly established law." *Turner*, 313 F. Supp. 3d at 711. For a right to be clearly established, existing precedent in the jurisdiction where the alleged action occurred must have placed the constitutional right at issue "beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *Turner*, 313 F. Supp. 3d at 711. Defendants must have at least "fair warning" that their conduct violated the plaintiff's constitutional rights. *Turner*, 313 F. Supp. 3d at 711 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (internal quotations omitted).

As discussed above, not only are the rights Plaintiffs are asserting not clearly established, but they are directly contradicted by the established precedent. Both Supreme Court and Fourth Circuit case law establish that citizens have no right to police protection, even to protect their

lives and safety, and certainly not to safeguard their public speech from being heckled. *DeShaney*, 489 U.S. at 203; *Pinder v. Johnson*, 54 F.3 1169, 1174 (4th Cir. 1995). Plaintiffs cannot argue for liability under a new extension of Fourteenth Amendment principles without violating Lieutenant Crannis-Curl's qualified immunity.

## **CONCLUSION**

Defendant Crannis-Curl respectfully requests that this Court follow the precedent set by *Thomas* and dismiss the case against her with prejudice because she has qualified immunity from a suit brought pursuant to 42 U.S.C. § 1983 for Plaintiffs' unprecedented constitutional claims. The First Amendment right to free speech prevents the government from infringing on Plaintiffs' freedom to speak, but it does not guarantee them police protection from interruption by private parties. The Equal Protection Clause of the Fourteenth Amendment does not create a right of action against defendants like Lieutenant Crannis-Curl who have no role in deciding who has access to a public forum. Finally, there is no supervisory liability for police commanders for unlawful conduct by private citizens, nor is there liability for police commanders when the troopers under their command have not violated any constitutional right. To the degree Plaintiffs advocate for an extension of constitutional rights contrary to the clear legal precedent applicable in this jurisdiction, qualified immunity bars Lieutenant Crannis-Curl from being held liable for violating rights that were not clearly established at the time of the Unite The Right rally.

Respectfully Submitted,

*/s/ Erin R. McNeill*
Marshall H. Ross (VA Bar No. 29674)
Senior Assistant Attorney General
Erin R. McNeill (VA Bar No. 78816)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone (Ross): 804-786-0046
Telephone (McNeill): (804) 692-0598
Fax: (804) 371-2087
E-mail: mross@oag.state.va.us
E-mail: emcneill@oag.state.va.us

*Counsel for Defendant Becky Crannis-Curl*

Mark R. Herring
Attorney General of Virginia

Samuel T. Towell
Deputy Attorney General

Tara Lynn R. Zurawski
Senior Assistant Attorney General/Trial Section Chief

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

*/s/ Erin R. McNeill*
Erin R. McNeill (VA Bar No. 78816)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0598
Fax: (804) 371-2087
E-mail: emcneill@oag.state.va.us

*Counsel for Defendant Becky Crannis-Curl*